J-S09035-14

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellee | |
| v. | |
| ROGER MITCHELL RIERA | |
| Appellant | No. 556 MDA 2013 |

Appeal from the Judgment of Sentence dated November 27, 2012
In the Court of Common Pleas of Lycoming County
Criminal Division at No: CP-41-CR-001459-2011

BEFORE:  MUNDY, OLSON, and STABILE, JJ.

MEMORANDUM BY STABILE, J.:               **FILED AUGUST 25, 2014**

Appellant Roger Mitchell Riera appeals from judgment of sentence of the Court of Common Pleas of Lycoming County (trial court), which, following a jury trial, convicted him of third-degree murder, voluntary manslaughter and aggravated assault.[1]  Upon review, we adopt the trial court's opinion addressing Appellant's post-sentence motion as well as its 1925(a) opinion and affirm the judgment of sentence.

Given the parties' intimate familiarity with the details of this case and the trial court's thorough recounting of the facts and procedural history, we need not further elaborate upon the background of this case.  **See** Trial

---

[1] 18 Pa.C.S. §§ 2502(c), 2503(b) and 2702(a)(1), respectively.

Court Opinion, 4/2/13, at 1-16, and Trial Court 1925(a) Opinion, 6/11/13, at 1-3.

Following the trial court's disposition of his post-sentence motion, Appellant filed a concise statement of errors complained of on appeal, raising a plethora of issues. The trial court issued an opinion in support of its ruling under Pennsylvania Rule of Appellate Procedure 1925(a). In disposing of Appellant's issues, the trial court in its 1925(a) opinion incorporated its April 2, 2013, opinion relating to Appellant's post-sentence motion.

On appeal,[2] Appellant raises the following eight issues for our review.[3] First, Appellant argues that the trial court erred in holding that the evidence was sufficient to convict him of third-degree murder under Section 2502 of the Crimes Code (Code), 18 Pa.C.S. § 2502, because the Commonwealth failed to establish malice.[4] Second, Appellant argues that the trial court erred in concluding that the jury's verdict was not against the weight of the

---

[2] We note that the docket reveals that Appellant filed a premature notice of appeal on April 1, 2013, because the trial court's 120-day period under Pa.R.Crim.P. 720(B)(3) to decide Appellant's post-sentence motion had not expired. Nonetheless, the docket indicates that Appellant filed a proper notice of appeal on April 3, 2013.

[3] Appellant has decided not to pursue his argument that the trial court erred in disallowing him to use his prior taped statement to the police, as he now considers the issue as one for collateral relief. *See* Appellant's Brief at 19-20. Also, Appellant has abandoned his argument that the trial court erred in complying with Pa.R.Crim.P. 600, relating to a prompt trial. *Id.* at 15.

[4] A challenge to the sufficiency of the evidence is a question of law, subject to plenary review. *Commonwealth v. Williams*, 871 A.2d 254, 259 (Pa. Super. 2005).

evidence.[5]  Third, Appellant argues that the trial court erred in precluding

him from raising the "stand your ground" defense, as set forth in 18 Pa.C.S.

_____

[5] Our Supreme Court recently explained the governing law pertaining to motion for a new trial based on a weight of evidence argument as follows:

> A motion for a new trial based on a claim that the verdict is against the weight of the evidence is addressed to the discretion of the trial court. **Commonwealth v. Widmer**, [] 744 A.2d 745, 751–52 ([Pa.] 2000); **Commonwealth v. Brown**, [] 648 A.2d 1177, 1189 ([Pa.] 1994).  A new trial should not be granted because of a mere conflict in the testimony or because the judge on the same facts would have arrived at a different conclusion.  **Widmer**, [] 744 A.2d at 752.  Rather, "the role of the trial judge is to determine that 'notwithstanding all the facts, certain facts are so clearly of greater weight that to ignore them or to give them equal weight with all the facts is to deny justice.'"  **Id.** at [] at 752 (citation omitted).  It has often been stated that "a new trial should be awarded when the jury's verdict is so contrary to the evidence as to shock one's sense of justice and the award of a new trial is imperative so that right may be given another opportunity to prevail."  **Brown**, [] 648 A.2d at 1189.

> An appellate court's standard of review when presented with a weight of the evidence claim is distinct from the standard of review applied by the trial court:

>> Appellate review of a weight claim *is a review of the exercise of discretion, not of the underlying question of whether the verdict is against the weight of the evidence.*  **Brown**, 648 A.2d at 1189.  Because the trial judge has had the opportunity to hear and see the evidence presented, an appellate court will give the gravest consideration to the findings and reasons advanced by the trial judge when reviewing a trial court's determination that the verdict is against the weight of the evidence.  **Commonwealth v. Farquharson**, [] 354 A.2d 545 (Pa. 1976).  One of the least assailable reasons for granting or denying a new trial is the lower court's conviction that the verdict was or was not against the weight of the evidence and that a new trial should be granted in the interest of justice.

> **Widmer**, [] 744 A.2d at 753 (emphasis added).

**Commonwealth. v. Clay**, 64 A.3d 1049, 1054-55 (Pa. 2013).  Therefore, our review necessarily is focused on evidence that the trial court's ruling is
*(Footnote Continued Next Page)*

§ 505(b)(2.3), and instructing the jury on the same.[6]  Fourth, Appellant argues that the trial court erred in admitting into evidence a cell phone video that, *inter alia*, depicted the dying victim, because the video was unfairly prejudicial and inflammatory.[7]  Fifth, Appellant argues that the trial court erred in disallowing him to introduce into evidence witness testimony establishing that the victim carried a knife one year prior to the deadly shooting.  Sixth, Appellant argues that the trial court abused its discretion in declining to charge "the jury to consider involuntary manslaughter as well as the heat of passion instruction for voluntary manslaughter and [disallowing Appellant from arguing] the same."[8]  Appellant's Brief at 5, 25.  Seventh, he argues that the trial court abused its discretion by imposing upon him an

---

*(Footnote Continued)* —————————————

"manifestly unreasonable or where the law is not applied or where the record shows that the action is a result of partiality, prejudice, bias or ill-will." ***Id.*** at 1055.

[6] "We review with deference decisions regarding instructions submitted to a jury; we may reverse the trial court only where we find that it abused its discretion or committed an error of law." ***Commonwealth v. Hornberger***, 74 A.3d 279, 282 (Pa. Super. 2013)

[7] Admission of evidence is within the sound discretion of the trial court and will be reversed only upon a showing that the trial court clearly abused its discretion.  ***Commonwealth v. Lilliock***, 740 A.2d 237, 244 (Pa.Super. 1999), ***appeal denied***, 795 A.2d 972 (Pa. 2000).

[8] To the extent this issue is inconsistent with—*i.e.*, broader than—the issue Appellant raised in the trial court, we decline to address more than the issue raised before the trial court.  ***See*** Pa.R.A.P. 302(a) ("Issues not raised in the lower court are waived and cannot be raised for the first time on appeal.")

excessive sentence.[9] Finally, Appellant argues that the trial court erred in determining that the Commonwealth did not violate Pa.R.Crim.P. 573(B)(1)(b) by failing to inform him prior to trial of a witness's change in testimony.

After careful review of the parties' briefs, the record on appeal, and the relevant case law, we conclude that the trial court's opinions, authored by President Judge Nancy L. Butts, thoroughly and properly dispose of Appellant's issues on appeal.[10]  ***See*** Trial Court Opinion, 4/2/13, at 16-32,

---

[9] It is well-settled that the proper standard of review when considering whether to affirm the sentencing court's determination is an abuse of discretion. ***Commonwealth v. Perry***, 32 A.3d 232, 236 (Pa. 2011) (citation omitted).  An abuse of discretion is more than a mere error of judgment; thus, a sentencing court will not have abused its discretion unless the record discloses that the judgment exercised was manifestly unreasonable, or the result of partiality, prejudice, bias or ill-will.  ***Id.***

[10] In the dissent's view, the circumstances perceived by the Appellant to "believe" and "estimate" the victim was reaching for a knife or gun were sufficient to require a "Stand Your Ground" instruction. The dissent reaches this conclusion by reading Sections 505(b)(2.3)(iii) and (b)(3) together. We respectfully disagree. Section 505(b)(2.3(iii) is unambiguous that an actor has no duty to retreat and has a right to stand his ground only if the person against whom force is used "**displays"** or otherwise "**uses"** a fireman or lethal weapon. This language does not admit a subjective "belief" or "estimate" by an actor that a firearm or lethal weapon may be used. The firearm or lethal weapon must be displayed or used for Stand Your Ground to apply. Section 505(b)(3) does not alter this unambiguous qualification. Rather, 505(b)(3) addresses the amount of force that may be used by an actor once protective force is justified. This section defers to the actor's judgment as to what force he believes is necessary to respond to the use of a firearm or lethal weapon against him. The trial court correctly found that no firearm or lethal weapon was displayed or used by the victim and therefore, that a Stand Your Ground instruction was not warranted.

and Trial Court 1925(a) Opinion, 6/11/13, at 3-9.  We, therefore, affirm the trial court's judgment of sentence.  We direct that a copy of the trial court's April 2, 2013 and June 11, 2013 opinions be attached to any future filings in this case.

Judgment of sentence affirmed.

Mundy, J., filed a concurring and dissenting memorandum.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 8/25/2014

IN THE COURT OF COMMON PLEAS OF LYCOMING COUNTY, PENNSYLVANIA

COMMONWEALTH OF PENNSYLVANIA   :     No. CR-1459-2011

                         :

            v.                    :

                         :     CRIMINAL DIVISION

ROGER MITCHELL RIERA,          :

      **Defendant**                :

## OPINION IN SUPPORT OF ORDER IN COMPLIANCE WITH RULE 1925(a) OF THE RULES OF APPELLATE PROCEDURE

Following a jury trial from August 13, 2012 to August 17, 2012, Roger Mitchell Riera (Defendant) was convicted of Murder of the Third Degree, a felony of the first degree;[1] Voluntary Manslaughter, a felony of the first degree;[2] and Aggravated Assault, a felony of the first degree.[3] On October 28, 2012, the Defendant filed a Post-Verdict Motion for Arrest of Judgment, which this Court denied following a hearing on October 22, 2012. On November 27, 2012, this Court sentenced the Defendant to fifteen (15) to thirty (30) years in a State Correctional Institution with a consecutive five (5) years of probation with the Pennsylvania Board of Probation and Parole.

On December 3, 2012, the Defendant filed a Post-Sentence Motion. On April 1, 2013, the Defendant filed a Notice of Appeal to the Superior Court of Pennsylvania. On April 2, 2013, this Court denied the Defendant's Post-Sentence Motion in an Opinion and Order, which also summarized the testimony presented at trial. The next day, the Defendant filed a Praecipe to Discontinue the Notice of Appeal filed on April 1, 2013 and filed another timely Notice of Appeal.

---

[1] 18 Pa.C.S. § 2502(c).
[2] 18 Pa.C.S. § 2503(b).
[3] 18 Pa.C.S. § 2702(a)(1).

On April 10, 2013, the Court ordered the Defendant to file a concise statement of the matters complained of on appeal in accordance with Pa.R.A.P. 1925(b)(1). On April 12, 2013, the Defendant alleged thirteen (13) issues: 1) the guilty verdict was based on insufficient evidence; 2) the guilty verdict was against the weight of the evidence; 3) the trial court erred by denying a motion for a speedy trial; 4) the trial court erred in denying the motions in arrest of judgment; 5) the trial court erred by precluding the defense from mentioning the Castle Doctrine in the opening statements; 6) the trial court erred when denying the Castle Doctrine when charging the jury; 7) the trial court erred in refusing to give jury instructions under the Castle Doctrine; 8) the trial court erred in not permitting the defense to use a taped interview of the defendant at the police station; 9) the trial court erred by permitting a cell phone video of the victim dying as evidence; 10) the trial court erred by now allowing defense testimony that the victim carried a knife; 11) the trial court erred by denying to give jury instructions for involuntary manslaughter; 12) the trial court erred by not vacating the verdicts which were inconsistent; and 13) that the Defendant's sentence was excessive and contrary to the fundamental norms of the sentencing process.

On April 29, 2013, the Defendant retained Eric Winter, Esq. to represent him on direct appeal to the Superior Court. Attorney Winter filed an Entry of Appearance, Petition to substitute Appearance as Counsel and Waiver of Time to File Opinion, and Petition to Extend Time and to Amend Concise Statement of Matters Complained of on Appeal. On May 1, 2013, this Court allowed Attorney Winter to enter his appearance and granted him an additional thirty (30) days to file an amended concise statement. On May 31, 2013, Attorney Winter filed an Amended Concise Statement of Matters Complained of on Appeal, which alleged twelve (12) issues: 1) whether the evidence was sufficient to support the verdicts of guilt; 2) whether the

2

verdicts were against the weight of the evidence; 3) whether the trial court erred in denying Defendant's motion to dismiss pursuant to Pa.R.Crim.P. 600; 4) whether the trial court erred in precluding the Defendant from arguing the castle doctrine; 5) whether the trial court erred in not instructing the jury as to the castle doctrine; 6) whether the trial court erred in not permitting the Defendant to use his prior taped statement to police; 7) whether the trial court erred in permitting a cell phone video of the victim shortly after the shooting; 8) whether the trial court erred in precluding evidence that the victim carried a knife; 9) whether the trial court erred in not allowing the jury to consider Involuntary Manslaughter or Voluntary Manslaughter; 10) whether the Defendant's sentence was excessive and contrary to fundamental norms; 11) whether the Commonwealth erred in failing to provide discovery on Fletcher's changed statement to police and whether the trial court took no action to protect the Defendant's rights; and 12) whether the Commonwealth committed prosecutorial misconduct in incorrectly stating facts and law in its closing argument.

### *Whether the trial court erred in not dismissing the Defendant's case pursuant to Pa.R.Crim.P. 600*

The Defendant alleges that this Court erred in denying a motion for speedy trial pursuant to Pa.R.Crim.P 600. First, the Court is unaware of a motion for speedy trial in this case. In addition, the court file and the docket statements do not show that a motion for speedy trial was ever filed. This Court, however, will still address whether the Defendant's case should have been dismissed pursuant to Pa.R.Crim.P. 600.

"[T]rial in a court case in which a written complaint is filed against the defendant shall commence within 365 days from the date on which the complaint is filed." Pa.R.Crim.P. 600(A)(2)(a). "Trial shall be deemed to commence on the date the trial judge calls the case to

3

trial . . . ." Pa.R.Crim.P. 600(A)(1). In determining when the trial should commence, only periods of delay caused by the defendant shall be excluded from the computation of the length of time of any pretrial incarceration. Pa.R.Crim.P. 600(C)(2). "[A] Trial court must grant a Rule 600(G) motion to dismiss unless it finds that the Commonwealth has exercised due diligence and that the circumstances occasioning the postponement were beyond its control." Commonwealth v. Meadius, 870 A.2 802, 805 (Pa. 2005) (citing Pa.R.Crim.P. 600(G)). The exercise of "due diligence" requires the Commonwealth to do everything reasonable within its power to guarantee that a trial begins on time. See id. at 807-08.

In this case, the Defendant requested continuances that delayed the trial. On September 18, 2011, the Defendant shot and killed Andrew Gula. The Criminal Complaint against the Defendant was filed on the same day. On November 14, 2011, the Court granted the Defendant's motion for a continuance of the pre-trial status conference till January 20, 2012 and for the criminal pre-trial conference to be continued to January 31, 2012. On December 12, 2011, the Court granted the Defendant's Motion to Extend Time to File Omnibus Pre-trial Motion, which stated that the sixty (60) day extension would be excludable for Rule 600 purposes. In addition, on January 31, 2012, the Defendant continued his criminal pre-trial conference to March 20, 2012.

Even if the Court disregards excludable time, the trial began within 365 days of the Criminal Complaint being filed, specifically on the 330th day. On April 12, 2012, the Court issued an Order scheduling jury selection for August 1, 2012 and for the trial to commence on August 13, 2012. The Defendant's trial commenced and finished within 365 days of the criminal

4

complaint being filed.[4] Even if the Defendant filed a motion for speedy trial pursuant to Pa.R.Crim.P 600 it would have been without merit and should have been denied.

***Whether the Commonwealth erred in failing to provide discovery on Fletcher's changed statement to police and whether the trial court took no action to protect the Defendant's rights***

The Defendant argues that the Commonwealth erred in failing to provide a changed statement made by Fletcher to police. Following the shooting, Fletcher had told police that the Defendant told the victim before shooting "get the f*** away from me," "get away from me," and/or "don't touch me." During trial, Fletcher testified that the Defendant told the victim "I told you I would f***in kill you," which defense counsel objected to following his testimony and the testimony of Yeagle. Defense counsel argued that they had not received this testimony in discovery. Outside the presence of the jury, Dincher testified that Fletcher changed his statement in June but that he still was not certain what the Defendant had stated. Due to the uncertainty of Fletcher, neither Dincher nor any other officer from the Williamsport Bureau of Police made a report of the new statement. The Commonwealth did learn of the statement leading up to trial.

In response to Brady v. Maryland, 373 U.S. 83 (1963), the Pennsylvania Rules of Criminal Procedure outlines mandatory discovery:

> (a) Any evidence favorable to the accused that is material either to guilt or to punishment, and is within the possession or control of the attorney for the Commonwealth.
>
> (b) Any written confession or inculpatory statement, or the substance of any oral confession or inculpaotyr statement, and the identity of the person to whom the confession or inculpaotry statement was made that is in the possession or control of the attorney for the commonwealth;

Pa.R.Crim.P. 573(B)(1)(a). Further, the Rules of Procedure states evidence that is discretionary with the court, which includes "all written or recorded statements, and substantially verbatim

---

[4] The jury rendered its verdict on August 16, 2012.

5

oral statements, of eyewitnesses the Commonwealth intends to call at trial." Pa.R.Crim.P. 573(A)(B)(2).

Whether the evidence is exculpatory or inculpatory determines the legal analysis. In Sullivan, a police officer testified at trial that the Defendant stated to police "he cocked the hammer" of a revolver before it went off and killed the victim. Commonwealth v. Sullivan, 820 A.2d 795, 801 (Pa. Super. 2003). The statement had not been disclosed to the Defendant during discovery. Id. The Superior Court found that the statement was inculpatory and therefore Brady did not apply. Id. at 804. The Superior Court, however, applied Pa.R.Crim.P 573(B)(1)(b) and found that for the Commonwealth to have to give the discovery to the Defendant it must have been "within the possession or control of the attorney for the Commonwealth." Id. In that case, "[t]he Commonwealth was not in possession of the disputed statement, therefore the prosecution had no obligation to provide it to the defense." Id.

Here, the testimony of Fletcher was inculpatory and therefore Brady is not applicable. Because the statement was inculpatory the Commonwealth would have only been required to supply the statement to the Defendant if they were in possession or control of it, pursuant to either Pa.R.Crim.P. 573(B)(1)(b) or Pa.R.Crim.P. 573(B)(1)(2)(a)(ii). Dincher testified that no report was ever generated and so the Commonwealth was never in possession of the statement to give to the Defendant.

Further, the Defendant was not prejudiced by Fletcher's statement. The Court directed Fletcher to attend Court the next day in case defense counsel wanted to re-call him to the stand. In addition, Dincher was re-called to testify and impeached Fletcher's testimony at trial. Dincher recounted how Fletcher changed his statement about what the Defendant stated immediately

6

before the shooting and how he was uncertain. The Court finds that the Defendant's issue is without merit and that he is not entitled to relief.

**Whether the Commonwealth committed prosecutorial misconduct in incorrectly stating facts and law in its closing argument**

The Defendant alleges prosecutorial misconduct during the closing argument. "Generally, comments by the District Attorney do not constitute reversible error unless the unavoidable effect of such comments would be to prejudice the jury, forming in their minds fixed bias and hostility towards the defendant so that they could not weigh the evidence objectively and render a true verdict." Commonwealth v. Sampson, 900 A.2d 887 (Pa. Super. 2006) (citing Commonwealth v. Correa, 664 A.2d 607, 609 (Pa. Super. 1995).

The Defendant has not specified what facts or law were incorrectly stated during the closing argument. After a review of the record, the Court is unable to determine any facts that were misstated or objected to by defense counsel. The record does show that defense counsel objected to the Commonwealth's definition of malice. The Commonwealth stated that there were four (4) ways to infer malice in this case:

> COMMONWEALTH: [Y]ou may infer malice simply because the Defendant used a deadly weapon on a vital part of the [victim's] body. . . . You can infer malice because the Defendant did an action disregarding the fact that he was going to kill someone. . . . you could infer based upon the testimony alone that the Defendant did not actually believe he was in fear of death, that he was not in the kill or be killed situation. Lastly, you can find malice because he could have retreated safely. . . . You only need to find one thing that the Defendant did to find that he did this killing with malice and I just gave you four. The Defendant is guilty of third degree murder beyond a reasonable doubt.

Defense counsel objected that this was a misstatement of law because only the use of a deadly weapon on a vital part of the victim can infer malice. The three other facts can be used to find malice but not to infer malice.

7

The Court agreed with defense counsel that the Commonwealth misstated the law. N.T., August 16, 2012, p. 40. The fact that the Defendant did an action disregarding that he was going to kill someone, that he did not believe he was in a kill or be killed situation, or that he could have retreated may have been used by the jury to find malice, but not to infer it on their own.

Defense counsel requested that the Court correct the definition of malice in the jury instruction. Id. at 37. Defense counsel stated on the record that they did not object when the Commonwealth initially made the statement because they thought the Commonwealth was nearly done with their closing and that the Court could correct the misstatement during jury instructions. Id. The Court agreed to clarify that the law stated in the closing arguments was not binding and that only the law recited by the Court could be used to find the Defendant guilty:

> COURT: Let me remind you before I get into the elements of the offenses that both attorneys in their closing arguments have given you an indication or kind of a preview as to what the law will be with regard to the elements of those offenses. No disrespect to either attorney in their closing arguments, but I am ultimately the determiner of the law that you need to use in applying to decide whether or not the Commonwealth has met its burden of proof. So to the extent that my instruction on the law differs from what you may recall them stating I overrule them. And again, as I think I indicated to you the elements of the offenses of the three charges for which you'll have under consideration, the third degree murder, voluntary manslaughter and aggravated assault as well as the defense of justification, those instructions will be sent out with you and, in fact, what we'll do is we'll make one copy for each of you so that way you don't have to share one version you can have your own copy so that that will help you with the discussion in your determination.

Id. at 48. As requested by defense counsel, the Court clarified that the jurors were to follow the Court's jury instruction. In addition, the Court gave the jury copies of the instruction for third degree murder, voluntary manslaughter, and aggravated assault. The Court believes that any prejudice that resulted from the misstatement of law was corrected by the Court's clarification.

8

***Remaining issues raised by the Defendant's Concise Statement***

For the remaining issues raised by the Defendant, the Court will rely on its Opinion and Order dated April 2, 2013, which denied the Defendant's Post Sentence Motion.

DATE: 10 January 2013

By the Court,

Nancy L. Butts, President Judge

xc: Aaron Biichle, Esq.
Ken Osokow, Esq.
Eric Winter, Esq.
    Prince Law Offices
    646 Lenape Road
    Bechtelsville, PA 19505

9

IN THE COURT OF COMMON PLEAS OF LYCOMING COUNTY, PENNSYLVANIA

COMMONWEALTH OF PENNSYLVANIA   :   No. CR-1459-2011

               : 

v.                   :     CRIMINAL DIVISION

ROGER MITCHELL RIERA,        :
      Defendant             :

## OPINION AND ORDER

The Defendant filed a timely Post-Sentence Motion on December 3, 2012. Argument on

Defendant's Motion was held on January 4, 2013. As stated by Pennsylvania Rules of Criminal

Procedure 720(B)(3), the Court has 120 days from the filing of the motion to decide the Post-

Sentence Motion, which in this case would be April 2, 2013. Defense counsel, however, filed a

Notice of Appeal on April 1, 2013, prior to the Court issuing a decision and prior to the 120

days. Since the Court believes the Defendant has not filed an appeal from a final order, it is not

divested of jurisdiction. As provided by Pa.R.Crim.P. 720, the Court will issue its opinion on

April 2, 2013, the 120th day.

*Background*

Roger Mitchell Riera (Defendant) was charged with Murder of the Third Degree, a felony

of the first degree;[1] Voluntary Manslaughter, a felony of the first degree;[2] Involuntary

Manslaughter, a misdemeanor of the first degree;[3] Aggravated Assault, a felony of the first

degree;[4] Aggravated Assault, a felony of the second degree;[5] and Recklessly Endangering

Another Person, a misdemeanor of the second degree.[6] The charges were the result of the

---

[1] 18 Pa.C.S. § 2502(c).
[2] 18 Pa.C.S. § 2503(b).
[3] 18 Pa.C.S. § 2504(a).
[4] 18 Pa.C.S. § 2702(a)(1).
[5] 18 Pa.C.S. § 2702(a)(4).
[6] 18 Pa.C.S. § 2705.

shooting death of Andrew Gula (Gula) on September 18, 2011. On July 19, 2012, both the Commonwealth and the Defendant filed Motions in Limine. The Defendant sought to preclude a cell phone video of the crime scene moments after the shooting and autopsy pictures of the victim.[7] The Defendant also wanted to invoke the Castle Doctrine[8] during opening and closing statements and to have the Court give a self-defense jury instruction. The Commonwealth requested that the Defendant be precluded from introducing a video of the Defendant being interviewed by Agent Leonard A. Dincher (Dincher) of the Williamsport Bureau of Police. On August 8, 2012, after a hearing on the Motions and where the Court viewed photos submitted by the Commonwealth, the Court ruled upon which photos may be used, what photos could not be used, and what photos could be used if altered and reviewed by the Court again.[9] In addition, the Court indicated that the video recording of the Defendant being interviewed by Dincher would not be introduced unless defense counsel raised an appropriate hearsay exception. On August 10, 2012, the Court amended the August 8, 2012 Order and stated that the cell phone video of the crime scene moments after the shooting may be introduced at trial.

A jury trial was conducted in this matter from August 13, 2012 to August 17, 2012. The following testimony, which is summarized below, was given at trial:

a. *Police Office Eric Houseknecht*

Police Officer Eric Houseknecht (Houseknecht) of the Williamsport Bureau of Police testified that on September 18, 2011, he and Officer Joshua Bell responded to a three-tone emergency dispatch, indicating a felony in progress. N.T., 8/13/2012, p. 25. Houseknecht and Joshua Bell were in a marked police vehicle fifty (50) feet from the intersection of Fourth Street

---

[7] The cell phone video was taken by Alexander Thomas. See infra p. 10.
[8] See 18 Pa.C.S. § 505.

2

and Market Street. Id. at 27. They arrived at a small park located on the southwest corner of Fourth and Market and saw two people "either knelt over, beside, or bent over something or somebody." Id. Four (4) to five (5) other people were located in the park and they directed the officers further west on Fourth Street, as that was the direction the shooter had fled. Id. at 29. The shooter was described as a "tall dude with a ponytail." Id. at 30.

As Houseknecht drove down Fourth Street an unidentified individual pointed north towards the municipal lot. Id. at 30-31. Two (2) males and one (1) female were in the parking lot and the officers made contact with them. Id. at 31. One of the males stated that he had shot somebody and he was immediately taken into custody. Id. at 31-32. At trial, the Defendant was identified by Houseknecht as the individual that stated he was the shooter on September 18, 2011. Id. at 32.

### b. Police Office Joshua Bell

The testimony of Officer Joshua Bell (Bell) of the Williamsport Bureau of Police is substantially similar to that of Houseknecht. Bell stated that they responded to the crime scene, that they were told by bystanders to head west on Fourth Street, that on Fourth Street people were pointing north towards the municipal lot, and that the Defendant was located in that lot. Id. at 40-43. In addition, the Defendant told Bell that the gun was in his pocket. Id. at 48. Bell searched the Defendant and he found in his front left jean pocket a firearm inside of a pocket holster. Id. at 43.

---

[9] At the hearing, the Commonwealth did not know what photos they planned to use at trial and submitted all autopsy photos for the Court to assess.

3

c. *Agent Leonard Dincher*

Agent Leonard Dincher (Dincher) of the Williamsport Bureau of Police testified that he obtained security video footage from a restaurant located on West Fourth Street. Id. at 53. One set of video points west on Fourth Street and away from the crime scene. Id. The video showed Duke Deljanovan, Adam Phillips, Jade Yeagle, and the Defendant leaving the scene of the shooting. Id. at 55. The Defendant makes a phone call as he is walking away from the scene, which is a call to 911. Id. All the individuals walk west on Fourth street and turn right onto Court Street. Id. Alexander Thomas and Horace Fletcher follow behind the Defendant. Id. at 56. Shortly thereafter, the police vehicle with Houseknecht and Bell can be seen going west on Fourth Street and turning into the municipal lot.

Another set of security video was obtained and was in the same exact location but facing east on Fourth Street. Id. at 57. Once again the video showed Duke Deljanovan, Adam Phillips, Jade Yeagle, and the Defendant leaving the scene of the shooting. Id. at 59. The video also showed Alexander Thomas and Horace Fletcher following the Defendant. Following the videos being played, the parties stipulated that Dincher searched Gula's vehicle and no weapon was found. Id. at 64.

Defense counsel questioned Dincher in regards to Gula's vehicle. Id. at 66. The vehicle was located at 5:32 AM on September 18, 2011, and a police officer stayed with the car until it was towed away at 6:05 AM. Id. at 66. No police officer was with the vehicle from 1:56 AM to 5:30 AM. Id. at 67. The vehicle was subsequently searched on September 21, 2011. Id. In addition, the crime scene was not searched until shortly after 2:00 AM. Id. at 68.

4

*d. Brian Savage*

On September 18, 2011, Brian Savage (Savage) testified that he went to Rumrunner's bar with his friends Tanicia Cunningham and Alex Thomas for last call. Id. 83. They had previously been at a bar named The Cell Block, where he consumed two (2) drinks. By the time they arrived at Rumrunner's they were not allowed to enter so they stood outside. Id. After having a brief conversation, the Defendant and his friends exited the bar. Id. at 84. Savage continued to talk to his friends until he noticed the Defendant and Gula begin to have "a little bit of a pushing match." Id. at 85. One of the Defendant's friends had left the bar with a six pack in a plastic bag and Gula wanted to have another drink. Id. at 86. Gula was upset that he could not get back in the bar and was trying to get one of the beers from the Defendant's friend by force, which resulted in the "pushing match and a shouting match." Id. It had appeared that Gula was at the bar by himself and was not with anyone else. Id. at 87. One of the Defendant's friends had started to hold him back as things began to escalate. Id. at 88. Savage began to hold back Gula, as there was nobody holding him back. Id. Savage was in-between the Defendant and Gula, but facing Gula. Savage did not remember specifically what was said and nothing stuck out as out of the ordinary. Id. at 89. He did not hear anyone say they were going to kill the other. Id. at 90. The Defendant's friend had gotten the Defendant to start walking down the side walk but before he started walking away he gave a head fake and lunged at Gula. Id. at 91. Gula became angrier after the Defendant had lunged at him. Id. at 92.

Savage continued to hold back Gula as the Defendant walked away. Id. While leaving, Gula and the Defendant continued hollering at each other. Id. at 94. After approximately sixty (60) to ninety (90) seconds, Savage let Gula go and he immediately starting running after the Defendant. Id. 94-95. Gula ran towards the corner of the street and within seconds of letting

5

him go Savage heard a pop. Id. at 95. The time that passed was approximately the time it would have taken Gula to run to the corner. Id. at 100.

### e. Rahim Baines

Rahim Baines (Baines) testified that he was at Old School Pizza with Rafael Montero at approximately 1:30 AM to 2:00 AM on September 18, 2011. Id. at 116. Baines had been friends with Gula for about seven years. Id. at 122. They walked towards Rumrunner's and at the corner of Fourth Street and Market Street they saw Gula being "held back from a few people at Rumrunner's." Id. at 119. "It looked like a fight was about to break out." Id. at 120. "It was a group of people yelling back at Andrew while Andrew was yelling back at them and there was like I know a fight was about to go down." Id. at 120. The group arguing with Gula headed towards the park area and while Baines was in the street Gula ran by him as if he was going to fight with someone. Id. 120, 124. Baines followed Gula and while going towards the corner he saw a flash and a loud noise. Id. at 121. Baines saw Gula fall to the ground and the person he was running toward "was yelling like he was just saying something. I can't remember what he was saying at that exact moment." Id. At the time of the shooting, the Defendant was arm's length from Gula. Id. at 125. Baines did not see Gula with a knife or weapon that evening and never knew him to carry a knife. Id. at 121, 124.

### f. Rafael Montero

Rafael Montero (Montero) testified that he was with Baines at Old Corner Pizza around 1:40 AM and 2:00 AM. Id. at 127. Montero was not from Williamsport and had not known Gula or the Defendant. As they began walking towards Rumrunner's they saw a commotion between a "shorter male and a taller male." Id. at 128. "The taller male went towards the corner

6

from which I just walked from and I was still at Rumrunner's and the other shorter male he was being held back by another male that he was with." Id. at 129. The shorter male was let go and chased after the taller person. Id. Montero followed the shorter person with Baines and saw "[t]he individual, being the shorter male, standing in front of the taller male and then the taller male turned around and I heard a gunshot happen. After that the shorter male fell to the ground." Id. at 130. The shorter male was "squaring up his hands" as he approached the taller male. Id. He did not see any objects in his hands. Id. at 132. Montero did not notice the taller male say anything to the shorter male prior to the gunshot. Id. at 131.

g. *Horace Fletcher, V*

On September 18, 2011, around 1:40 AM to 2:00 AM, Horace Fletcher (Fletcher) was leaving the Old Corner and heading towards Old School Pizza. Id. at 144. Fletcher noticed a commotion outside of Rumrunner's and saw his friend Alexander Thomas outside of the bar. Id. at 145. "There was a gentleman holding a kid back in a black hoodie and there was a bunch of people yelling." Id. at 146. On direct-examination, Fletcher could not make out what was being said between the group and the man being held back. Id. On cross-examination, however, Fletcher stated that Gula told the Defendant that he was going to F*** him up and threaten him. Id. at 164. Eventually the group with the Defendant walked north on Market Street. Id. at 147.

Once the party reached the Community Park, Gula was released and he commented to the crowd to "go f*** yourselves," and starting running towards the park. Id. at 148. Alexander Thomas told Fletcher that it looked like there was going to be a fight and Fletcher "took off with people in the crowd towards the park." Id. at 149. Fletcher was fifteen (15) feet behind Gula as he reached the park and saw "a guy standing there with a gun." Id. at 150-51. Gula continued to run towards the man with a gun and when he was about fifteen (15) to twenty (20) feet from him

7

he was shot. Id. at 151. Prior to the shot, the shooter said "I told you I would f***in kill you." Id. at 152. On cross-examination, Fletcher admitted that he had not initially made this statement to police.

Dincher was re-called to impeach the testimony given by Fletcher. N.T., 8/15/2012, p. 51. Dincher stated that Fletcher's original statement to police, on the day of the shooting, was that the Defendant said "get the f*** away from me," "get away from me," and/or "don't touch me." Id. at 53. In June, Fletcher talked to police and was uncertain of whether the Defendant may have said "I'll F***ing kill you," or what he related to police on the day of the shooting. Id.

h. *Jade Yeagle*

On September 18, 2011, Jade Yeagle (Yeagle) went to Rumrunner's after work to get a drink. N.T., 8/13/2012, p. 167. While sitting outside, Yeagle's drink was knocked over and she gave the Defendant money to get her another before last call. Id. at 167. The Defendant was unable to get another drink and they began to leave the bar. Id. "As we turned left to go up like what was that Market Street to get back towards Fourth Street the kids that were sitting at the table to the left of the door there - - they were boisterous and they were being upset, I guess one of the kids had been cut off and was saying things like to hell with this place we don't want to be here. F*** this bar. F*** everyone. And one of the gentleman that was with us, Adam Phillips, turned around said to the kid f*** me? And the kid was like, f*** you. And then he saw Mitch standing next to Adam and was like and f*** you, too, I head what you said about me." Id. at 167-68. Gula stated that the Defendant told people that he had made him cry and the Defendant admitted that he had. Id. at 168-69.

"The boys were kind of hollering back and forth over their shoulders and at that point they had Andy restrained and I think maybe Mitch tried to shake his hand at one point was like,

8

no, you know, we don't want to have this argument; but the whole time we were just walking away and as we got up around the end of the block they were still shouting obscenities back and forth at each other." Id. at 169. Yeagle testified that Gula yelled "walk away. Go ahead. F*** you. Walk away. Only Pussies walk away. I know where you live. F*** you." Id. at 174, 175. As Yeagle was walking down the street she could hear Gula saying to let him go and could then hear him running down the street. Id. at 170. She could hear the footsteps change from the concrete to the bricks of the courtyard and after that heard a shot. Id. at 170. She turned around and saw Gula on the ground. Id. Yeagle could not remember if the Defendant said anything prior to the shot but he may have said "stop." Id. at 176. The Defendant than pulled out his phone and called 911. Id.

### i.  Adam Phillips

On September 18, 2011, Adam Phillips (Phillips) was with Yeagle and the Defendant. N.T., 8/14/2012, p. 16. The Defendant and Gula were arguing, as indicated by Yeagle. Id. The Defendant tried to shake Gula's hand and apologize but Gula just said "F" you and the Defendant said okay and walked away. Id. at 17. "As we were walking we started to make the turn around into the Community Park and I heard several people screaming let him go, let him go, and as soon as I heard that we heard, well, I heard footsteps coming up the sidewalk and I turned around to see Andrew charging like a football player." Id. at 18. "He was running as fast as he could to try to tackle or do something and I turned around and I saw the gun go off and Andy hit the ground and after that I watched Mitch put his gun away and pull his phone out and dial 911, called the police, and we started walking towards the parking lot across the street from Kelly's." Id. While running towards the Defendant, Phillips testified that Gula said "I'll f***ing

9

kill you I know where you are. I'm going to come and find you." Id. at 24. He did not hear the Defendant say anything to Gula. Id. at 27.

### j. Duke Deljanovan

On September 18, 2011, Duke Deljanovan (Deljanovan) testified that there was a heated conversation between Gula and the Defendant between 1:40 AM and 2:00 AM. Id. at 30. Deljanovan stated that they were arguing about a prank but none of the words stood out to him. Id. Deljanovan began walking with the Defendant towards Fourth Street; Phillips and Yeagle were in front of him and he was parallel to the Defendant. Id. at 33. He heard footsteps coming up on them and before he had "a chance to turn around and look what was coming up [he] heard a crack." Id. Deljanovan did not hear anything besides the footsteps and the crack. Id. at 34.

### k. Tanicia Cunningham

On September 18, 2011, Tanicia Cunningham (Cunningham) was with Savage and Alexander Thomas at 2:00 AM. Id. at 40. They were outside of Rumrunner's when a verbal altercation began. Id. Savage had gotten ahold of Gula and at a certain point someone lunged at Gula. Id. at 40, 41. The party arguing with Gula began walking down the street and Savage was "effortlessly" holding back Gula. Id. at 41. Savage let Gula go and he began to run down the block. Id. at 42. Cunningham and Alexander Thomas began running behind Gula, in order to see what was going to happen. Id. at 42. Gula had turned the corner and she had a heard a shot. Id. As Gula was running, Cunningham did not see him grabbing for anything and did not hear anyone say anything. Id. at 43. Cunningham stated that Gula was jogging and that she could keep up with him in her heels. Id.

10

*1. Alexander Thomas*

On September 18, 2011, Alexander Thomas (Thomas) was with Cunningham and Savage around 1:40 AM to 2:00 AM. Id. at 51. Thomas saw Gula being forced out of Rumrunner's by a bouncer and that a verbal alteration began between the Defendant and Gula. Id. Gula shoved the Defendant into tables at one point. Id. at 52. While Gula shoved the Defendant, the Defendant had his hands in his pockets. Id. at 53.

The situation appeared to be defused but Gula continued to be angry. Id. at 54. After being released from Savage, Gula realized he was released and ran towards Fourth Street. Id. at 55.

> When he took off he like fell and could barely like, you know, get his grounding. Even then he was like stumbling and he kind of like caught himself like walking on all fours for like a second, caught himself from falling then continues to stumble zig zaggy down after him. So we run after him like the group of us, I did and Tanicia was at my left side and Happy, Horace Fletcher, was on my right side. It's like we're laughing and stuff it's a bar fight because I went to school with Happy I've known him for while and we've seen tons of bar fights up like at Kimble's bar and stuff like that just people being idiots and so we run after them thinking, you known, all fun and games and then right when - - and I was like 10 feet kind of behind Andrew and so is Tanicia and right when Gula made the corner I heard like a loud pop and flash off the building. I grabbed Tanicia I was like whoa that wasn't what I think it was, was it? And then we - - I cautiously proceeded around the corner and that's when I saw Andrew laying on his face, moaning and I'm like - - I'm pretty sure I thought that was a gun and I hope like he got scared and fell, you know, all this stuff was going through my mind hope this, hope that; but then when he rolled over there was like blood on the ground and while I was running after him before the shooting I had taken out my phone because I was thinking I was going to record a fight. So I thought it's a typical little fight scene and it would be funny to have on your phone.

Id. at 56. The phone recording made by Thomas was then played by the Commonwealth. Id. at 66-69. The recording depicted the crime scene, Thomas following the Defendant, and Cunningham administering help to Gula.

11

### m. Police Officer Aaron Levan

On September 18, 2011, Police Officer Aaron Levan (Levan) responded to a triple tone emergency call at 1:56 AM. Id. at 84. Levan first went to Court Street and Fourth Street, where the shooter was reported to be located. Id. 85. After arriving, Levan saw that the shooter was under control and ran down Fourth Street to find the victim laying on the ground in the park. Id. at 85-86. There was a white male doing compressions and a white male doing mouth to mouth. Id. at 87. Levan had the individuals stop, checked Gula's pulse and determined that he had agonal respirations. Id. Levan then pat down Gula and did not find a weapon or knife on him. Id. Levan began CPR on Gula again and once paramedics arrived he went with them to the hospital, where no weapon was found on his person or his clothes. Id. at 88.

### n. Steven Lewis

On September 18, 2011, Steven Lewis (Lewis), who was a corpsman for the Navy and had combat medical training, was having a beer at Rumrunner's when he heard people arguing outside. N.T., 8/15/2012, p. 8. After he closed his tab, he exited the bar and followed people walking towards Fourth Street. Id. When Lewis got to the Community Park, he saw a person laying on the ground, one person kneeling down, and another standing above him. Id. at 9. Lewis did not notice anything on the ground or anyone reaching for any type of object. Id. at 10. Lewis began assessing Gula for wounds and a pulse. Id. at 11. Lewis never noticed anything in Gula's hands, pockets, or laying around his body. Id. at 12.

### o. Dr. Barbara Bollinger

Dr. Barbara Bollinger (Bollinger) is a forensic pathologist and testified as an expert witness. Id. at 27-28. As a result of an autopsy conducted on Gula, Bollinger concluded that:

12

Mr. Gula had a penetrating gunshot wound to his chest. This involved a gunshot entrance would at the base of his neck just a little to the left of midline. The gunshot or the projectile entered the chest cavity and perforated the aorta, which is the largest blood vessel coming off of the heart, which supplied the body with blood. It also perforated the carotid artery and the subclavian artery and then the bullet passed through the upper lobe of the left lung and was recovered from the back of the decedent just below the left shoulder blade.

Id. at 30-301. The entrance of the gunshot wound would be a vital part of the body. Id. at 31.

Photographs of the entrance wound and the bullet recovered from Gula's body were introduced at trial. Id. at 31, 33, 35, and 36.

In addition, there was no soot or stippling associated with the gunshot entrance wound. Id. at 34.

Soot is gun powder residue, which is imparted on the skin. Soot occurs when a weapon is held in very close proximity and/or against the skin with a gunshot entrance wound site. It represents unburned particles of gun powder. Stippling is partially burned flakes of powder that gets imparted on the skin also around the gunshot entrance wound. Stippling occurs generally at what is called an intermediate range of fire, it's not in close contact with the skin; but the weapon is held within some inches of the skin, inches to a foot. Stippling can be sued to determine range of fire between the weapon and the decedent's or the victim's skin.

Id. As a result of the autopsy, the cause of death was a gunshot wound to the chest. Id. at 37.

The manner of death was found to be homicide. Id. Gula's blood ethanol level was 0.22 percent and his blood Citalopram level was 160 nanograms per milliliter, which is an antidepressant and also known as Lexapro. Id. at 39.

*p. Defendant*

The Defendant testified in regards to September 18, 2011. Id. at 61. The Defendant first saw Gula at Rumrunner's trying to purchase a drink. Id. at 63. The Defendant and Gula spoke and they discussed how they were doing and that they needed to scrap for parts in the future. Id. at 64. The bartender refused to serve Gula and "he threw a bit of a fit saying my money is not

13

good enough and went into a bit of a tangent." Id. After Gula left, the Defendant tried to get a drink for Yeagle but the bartender refused because it would not be fair. Id. at 62, 65.

The Defendant went outside and saw Gula screaming about how he could not get served and telling people to f*** themselves. Id. The Defendant testified that Gula told Phillips, in reference to him, he was going to beat him up and f***ing kill him. Id. at 66. Then Deljanovan walked out of the bar and Gula began thrashing at some chairs but ended up stumbling over them. Id. Gula then attempted to go after the Defendant and Deljanovan steped in-between them and tried to hold back Gula. Id. Savage then assisted Deljanovan and began to hold back Gula. Id. While Savage was holding Gula from behind, the Defendant tried to reason with Gula because he was screaming and saying he was going to f***ing kill him. Id. at 68. "Well, he accused me of talking to somebody, telling people that I made him cry and I told him, no, it's not like that I didn't do that and it's not the way you think it is. Everything is fine. Calm down. He's screaming no. F*** you. I'm going to kill you." Id.

The Defendant then left Gula and began walking towards Fourth Street. Id. at 70. While walking away, the Defendant stated that he was still trying to reason with Gula and told him to call him in the morning, but Gula continued to scream that he was going to kill him and that he knew where he lived. Id.

> I just turned around and realized there is no calming him down. They're still going to hold him so I jogged, caught back up to my group, probably about two seconds, three seconds worth of jogging to catch up to them, turned the corner and now I'm back with them and we're starting to walk and I'm hearing let him go, let him go. Let him take care of his own shit. Let him deal with this. And I thought nothing of it and then moments later I hear these footsteps. I turned around and there is this guy screaming he's going to kill me and running after me. That's when I tell him to stop and I tell him no. He won't listen. Still coming after me. He's in this crazed sprint. Then in this motion where he's reaching by his side I tell him no and stop. He won't. I draw my weapon and I point it at him. Tell him again no and stop and he won't and that's when I fired. He took a few more steps - - all of this is while I'm running backwards, cutting back to the left - - he took a few more steps even after he was shot. I'm still just trying to get away and then he

14

just - - just smashes onto the ground, basically head first, face first, this huge thud. And then I continue to leave because there is a crowd of people them coming after me screaming let's f***in get him, let's f***in get him. Before I know it there's several people, more than I can count, at least 10, 15 people coming after me in the brickyard and then I get out of the brickyard and there is still people pursuing me and then people coming from one angle across the street, another angle and then it felt like I was being closed in by just everybody. That's when I told Adam and Jade to get away from me and to keep moving. And I was on the phone with the police, made my way to the parking lot where the car was and it took them awhile to get there and that's when I flagged them down and that was about it.

Id. at 71-72. While Gula ran after the Defendant he was yelling that he was going to kill him. Id. 103. The Defendant stated that he was aiming to shoot Gula in the shoulder and believed that is where he had shot him. Id. at 73. The Defendant saw Gula coming at him and drawing a weapon and he just wanted to defuse the situation. Id. at 73-74, 81. Gula was reaching at his mid-waist and it appeared that he was trying to draw. Id. at 107, 108. The Defendant does not know what he was drawing and could not give a description of it. Id. at 108, 125.

On August 15, 2012, following all the testimony, the Commonwealth withdrew the charges of Involuntary Manslaughter, a misdemeanor of the first degree; Aggravated Assault, a felony of the second degree; and Recklessly Endangering Another Person, a misdemeanor of the second degree. On August 17, 2012, the jury found the Defendant guilty of Murder of the Third Degree, Voluntary Manslaughter, and Aggravated Assault. On August 28, 2012, the Defendant filed a Post-Verdict Motion for Arrest of Judgment, which was denied after argument on October 22, 2012.[10] On November 27, 2012, this Court sentenced the Defendant to fifteen (15) to thirty (30) years in a State Correctional Institution with a consecutive five (5) years of probation with the Pennsylvania Board of Probation and Parole.

---

[10] The Defendant alleged that even in the light most favorable to the Commonwealth, the evidence was insufficient to support a verdict of guilty for the charge of Murder of the Third Degree.

15

On December 3, 2012, the Defendant filed a Post-Sentence Motion.[11] Argument on the Motion was held before this Court on January 4, 2013. The Defendant raised the following issues: 1) the verdict was against the weight of the evidence; 2) the verdicts of guilt were not supported by sufficient evidence; 3) the Court should have allowed the Castle Doctrine to be argued in opening statements and should not have denied the Castle Doctrine Justification when charging the jury; 4) the Defendant should have been able to admit the taped video interview by Dincher; 5) the phone video was unfairly prejudicial; 6) evidence that Gula carried a knife should have been permitted at trial; 7) the Court improperly denied giving jury instructions for Involuntary Manslaughter; 8) the verdicts of guilt should be vacated because the Defendant was found guilty of both Murder of the Third Degree and Voluntary Manslaughter; and 9) the sentence was unreasonable and excessive. Following a thorough review of the record, the Court finds that the Defendant's motion is without merit for the below reasons.

## Discussion

### Whether the verdict was against the weight of the evidence

The Defendant alleges that the jury's verdict was against the weight of the evidence. A trial court cannot upset a verdict because of a mere conflict in testimony or because the trial judge would have arrived at a different conclusion based on the same facts. Armbruster v. Horowitz, 813 A.2d 698, 703 (Pa. 2002). "A new trial should be granted only in truly extraordinary circumstances, i.e., 'when the jury's verdict is so contrary to the evidence as to shock one's sense of justice and the award of a new trial is imperative so that right may be given another opportunity to prevail.'" Id. (citing Commonwealth v. Brown, 648 A.2d 1177, 1198 (Pa. 1994).

[11] The Court shall decide a post-sentence motion within 120 days of the filing of the motion. Pa.R.Crim.P.

16

The determination of whether to grant a new trial because the verdict is against the weight of the evidence rests within the discretion of the trial court, and we will not disturb that decision absent an abuse of discretion. Where issues of credibility and weight of the evidence are concerned, it is not the function of the appellate court to substitute its judgment based on a cold record for that of the trial court. The weight to be accorded conflicting evidence is exclusively for the fact finder, whose findings will not be disturbed on appeal if they are supported by the record. A claim that the evidence presented at trial was contradictory and unable to support the verdict requires the grant of a new trial only when the verdict is so contrary to the evidence as to shock's one's sense of justice.

Commonwealth v. Young, 692 A.2d 1112, 1114-15 (Pa. Super. 1997) (citations omitted).

The Defendant's Post-Sentence Motion does not state what charges were against the weight of the evidence or why they were against the weight.[12] The Court, however, has reviewed the record and has determined that Defendant's issue is without merit. While every witness that testified at the trial had a different rendition of the facts, "[t]he finder of fact is free to believe all, part or none of the evidence and to determine the credibility of the witnesses." Commonwealth v. Keaton, 729 A.2d 529, 540 (Pa. 1999).

Further, the vast majority of the evidence showed that the Defendant intentionally and knowingly shot Gula, including the Defendant's own testimony. Evidence showed that the Defendant and Gula had not engaged in a physical altercation prior to the shooting and that Gula never threatened to kill the Defendant. In addition, multiple witnesses testified that Gula ran towards the Defendant and after he turned the corner of the street/building he was immediately shot. There is very conflicting testimony on whether the Defendant or Gula said anything right before the shot but based on the facts and the timing of the shooting it is likely that nothing or very little was said. Based upon the record, the Court cannot find that the verdict was so

---

720(B)(3)(a).

[12] See Pa.R.Crim.P. 720(B)(1)(a) ("All requests for relief from the trial court shall be stated with specificity and particularity . . .").

17

contrary to shock one's sense of justice and thus the verdict was not against the weight of the evidence.

### *Whether the verdicts of guilt were not supported by sufficient evidence*

Similar to the issue analyzed above, the Defendant argues that the verdict was not supported by sufficient evidence. A claim challenging the sufficiency of the evidence is a question of law. Evidence will be deemed sufficient to support the verdict when it establishes each material element of the crime charged and the commission thereof by the accused, beyond a reasonable doubt. Commonwealth v. Karkaria, 625 A.2d 1167 (Pa. 1993). The Commonwealth's burden of proving the elements may be sustained by means of wholly circumstantial evidence. Commonwealth v. Thomas, 350 A.2d 847, 849 (Pa. 1976). A court is required to review the evidence in the light most favorable to the verdict winner giving the prosecution the benefit of all reasonable inferences to be drawn from the evidence. Commonwealth v. Chambers, 599 A.2d 630 (Pa. 1991).

#### a. Third Degree Murder

For the charge of Third Degree Murder, the Commonwealth must prove that there was an unlawful killing and that it was done with "malice." There is no question that the Defendant shot and killed Gula. Here, the main issue with Third Degree Murder is whether there was "malice" or not.

> Malice consists either of an intent to kill or to inflict great bodily harm or of a wickedness of disposition, hardness of heart, cruelty, recklessness of consequences, any mind regardless of social duty indicating an unjustified disregard for the probability of death or great bodily harm, and an extreme indifference to the value of human life. Malice may be either expressed by the Defendant or implied from his words and conduct. When a deadly weapon is intentionally used against a vital part of the human body, malice may be inferred to exist.

18

Commonwealth v. Myers, 621 A.2d 1009, 1011 (Pa. Super. 1993). Even though the Defendant testified that he aimed for Gula's shoulder, the entry wound was at the base of the neck/ top of the chest. Bollinger stated that the neck/chest area that Gula was shot was a vital part of the body. This is illustrated by the fact that the bullet perforated his aorta, carotid artery, and the subclavian artery. If the Defendant merely wanted to defuse the situation, shooting Gula in the shoulder or neck was ill-advised, especially when many less risky alternatives existed. The intentional use of the gun to shoot Gula in the neck/chest could alone infer malice.

Moreover, the facts circumstantially prove malice. The altercation between the Defendant and Gula had not escalated physically prior to the Defendant shooting Gula. Multiple witnesses, including Savage and Cunningham, stated that the Defendant had lunged towards the Defendant before walking away. The Defendant also stated that he jogged back to walk with his friends but testimony of Yeagle, Phillips, and Deljanovan indicated that the Defendant was walking behind them. Further, testimony from almost all the witnesses show that the Defendant shot Gula almost immediately after he turned the corner and that he did not warn Gula prior to the shooting. The evidence viewed in the light most favorable to the Commonwealth strongly suggests that the Defendant incited Gula by lunging at him and then while hearing people yelling to let Gula go he walked slowly in anticipation of inviting an altercation. When Gula turned the corner the Defendant appeared to be prepared and immediately shot Gula in the chest, all without any kind of warning. The fact that the Defendant had to remove the gun from his pocket and his pocket holster and that he shot Gula so quickly also corroborated the fact that the Defendant anticipated Gula's arrival.

Finally, the Defendant's own testimony showed malice. The Defendant testified with regard to the events that lead to him shooting Gula in the neck/chest. The Defendant appeared

19

arrogant and unremorseful in his account of the events. The Defendant also became argumentative and difficult during cross-examination. His own testimony appeared to relate a "wickedness of disposition, hardness of heart, cruelty, and recklessness of consequences." As such, the Court finds that there was sufficient evidence for the jury to convict the Defendant of Murder of the Third degree.

### b. Voluntary Manslaughter

For Voluntary Manslaughter the Commonwealth had to prove that at the time of the killing the Defendant believed the circumstances to be such that, if they existed, would justify the killing under Chapter 5 of this title (relating to general principles of justification), but that his belief was unreasonable. 18 Pa.C.S. § 2503. "To prevail on a justification defense, there must be evidence that the defendant "(a) . . . reasonably believed that he was in imminent danger of death or serious bodily injury and that it was necessary to use deadly force against the victim to prevent such harm; (b) that the defendant was free from fault in provoking the difficulty which culminated in the slaying; and (c) that the [defendant] did not violate any duty to retreat." Commonwealth v. Sepulveda, 55 A.3d 1108, 1124 (Pa. 2012).

Based on the testimony and evidence, there was sufficient evidence for the jury to convict the Defendant of Voluntary Manslaughter. The Defendant stated that he was in fear for his life and safety, however, the circumstances appear that this was unreasonable, as there had not been a physical altercation, there were no weapons used, and there were numerous people near the altercation who already proved that they would intervene.[13] Witnesses also indicated that the Defendant was larger than Gula. In addition, while the Defendant did not provoke the use of

---

[13] The testimony of the Defendant was extremely inconsistent with other witnesses. The biggest discrepancies would be Defendant's testimony that he repeatedly tried to calm Gula, that Gula said he would kill him, and that he warned Gula two times before shooting him.

20

deadly force, he did engage Gula in a verbal altercation by arguing and by lunging at Gula, as stated by witnesses. The Defendant was the first to make physical contact, which happened to be deadly force. The record shows that there was sufficient evidence to support the conviction of Voluntary Manslaughter.

### c. Aggravated Assault

The Commonwealth had to prove for the charge of Aggravated Assault that the Defendant feloniously attempted to cause, or intentionally, knowingly, or recklessly did cause, serious bodily injury to another under circumstances manifesting extreme indifference to the value of human life. 19 Pa.C.S. § 2702(a)(1). For the reasons listed above, the Court finds there was sufficient evidence for the conviction of the lesser included offense of Aggravated Assault.

**Whether the Court should have allowed the Castle Doctrine to be argued in opening statements and should not have denied the Castle Doctrine Justification when charging the jury**

The Defendant argues that the Castle Doctrine was applicable to the facts of this case and that the Court improperly denied defense counsel from arguing it in her opening statement. The Defendant also alleges that the Court should have given the Castle Doctrine Justification instruction when charging the jury. The relevant portion of the Castle Doctrine states:

> (2) The use of deadly force is not justifiable under this section unless the actor believes that such force is necessary to protect himself against death, serious bodily injury, kidnapping or sexual intercourse compelled by force or threat; nor is it justifiable if:
>
> . . . .
>
> > (ii) the actor knows that he can avoid the necessity of using such force with complete safety by retreating, except the actor is not obliged to retreat from his dwelling or place of work, unless he was the initial aggressor or is assailed in his place of work by another person whose place of work the actor knows it to be.

21

. . . .

(2.3) An actor who is not engaged in a criminal activity, who is not in illegal possession of a firearm and who is attacked in any place where the actor would have a duty to retreat under paragraph (2)(ii), has no duty to retreat and has the right to stand his ground and use force, including deadly force, if:

    (i)      the actor has a right to be in the place where he was attacked;

    (ii)     the actor believes it is immediately necessary to do so to protect himself against death, serious bodily injury, kidnapping or sexual intercourse by force or threat; and

    (iii)    the person against whom the force is used displays or otherwise uses:

        (A) A firearm or replica of a firearm as defined in 42 Pa.C.S. § 9712 (relating to sentences for offenses committed with firearms); or

        (B) Any other weapon readily or apparently capable of lethal use.

18 Pa.C.S. § 505.

The Court finds it did not err when it denied defense counsel from arguing the Castle Doctrine during opening statements. The Court had not heard any of the evidence prior to trial and had no way of knowing whether the Castle Doctrine was applicable. Therefore, the Court in an Order dated August 8, 2012 found that defense counsel and the Commonwealth were not allowed to argue the Castle Doctrine in opening statements. The Court stated that if "sufficient evidence [had] been established to make the Castle Doctrine relevant the parties may refer to the Doctrine during closing arguments and an appropriate jury instruction [would] be given." Argument on the Castle Doctrine in opening statements would have confused and prejudiced the jury if it was revealed by the facts it was inapplicable and the Court found that a jury instruction was not warranted. See Pa.R.E. 403.

Further, after the Court heard the testimony and evidence presented at trial, the facts showed that the Castle Doctrine was not applicable. First, deadly force was not necessary to

22

protect the Defendant against death or serious bodily injury as discussed in the previous section.[14] Gula and the Defendant had not engaged in a physical altercation and no weapon had been displayed. In addition, the Defendant stated on the record that he saw Gula grabbing for something as he ran towards him but he was not sure what it was. There was no evidence that Gula had a weapon and no other witnesses, besides the Defendant, saw Gula reach for any objects; in fact at trial, the Defendant testified he did not see anything. Since the Defendant did not need to use deadly force, did not see Gula with a weapon, and could have avoided the necessity of using deadly force; the Court finds that it was proper in denying the Castle Doctrine jury instruction.

### *Whether the Defendant should have been able to admit the taped video interview by Dincher*

The Defendant argues that the Court erred in not allowing a taped interview of the Defendant by Dincher to be introduced by the Defendant. On July 19, 2012, the Commonwealth filed a Motion in Limine stating that the video should be precluded if the Commonwealth does not introduce the evidence in its case in chief. On August 8, 2012, the Court stated that "[i]f the Commonwealth does not introduce a video recording of the Defendant being interviewed by Agent Leonard A. Dincher during their case in chief, the Defendant will only be allowed to introduce the video if an appropriate hearsay exception as dictated by the Pennsylvania Rules of Evidence is applicable." The Court did not state that it could only be used as "rebuttal evidence" as indicated in the Defendant's Post-Sentence Motion.

Subsequently, the Defendant never tried to introduce the video at trial and never argued any hearsay exception. As defense counsel never tried to admit the video at trial, the Court finds that this issue has been waived. Further, the statement was "hearsay" as it was "a statement,

---

[14] See supra p. 19.

23

other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Pa.R.E. 801(c). As such, the Court was not improper in requesting an exception to be argued prior to allowing the video to be introduced into evidence.

*Whether the phone video was unfairly prejudicial*

The Defendant argues that the Court abused its discretion by permitting a cell phone video into evidence. The video in question depicts the crime scene moments after the Defendant shot Gula on September 18, 2011. When determining whether photos or videos should be admitted into evidence over the objection of a party the Court must apply a two-part test. Commonwealth v. Eichinger, 915 A.2d 1122 (Pa. 2009); Commonwealth v. Conway, 534 A.2d 541 (Pa. Super. 1987) (applying two step analysis to determine if a video tape was prejudicial and inflammatory). First, the Court must determine whether the photographs or video are inflammatory. Id. If the court decides that they are inflammatory, it must determine that they have essential evidentiary value before they permit the jury to view them. Id.

The Defendant supports their position by relying on Funk. Commonwealth v. Funk, 29 A.3d 28 (Pa. Super. 2009). In Funk, the trial court allowed crime scene and autopsy photos that depicted a violent struggle. Id. at 33. The Superior Court found that the photos were essential to the Commonwealth's burden to prove an intentional killing for Murder in the First Degree. Id. The photos also discredited the defendant's version of events by showing defensive wounds. Id.

Here, it is arguable whether the cell phone video of the crime scene mere moments after the shooting was inflammatory. The crime of Third Degree Murder itself is of a nature that would result in evidence and of video that would tend to inflame a jury. Further, the video was not overly graphic and merely depicted the nature of the crime in real time. The video showed

24

the Defendant leave the scene, the police arrive on the scene seconds later, and a bystander rendering aid to Gula. While the Court does not find the video to be inflammatory, the essential evidentiary nature of the video renders this issue irrelevant.

The Court finds that the evidentiary value of the video was essential to this proceeding. First, the video was relevant to whether the Defendant had malice for the charge of Murder of the Third Degree. "Murder in the third degree is an unlawful killing with malice but without the specific intent to kill." Commonwealth v. Santos, 876 A.2d 360, 363-64 (Pa. 2005). Malice is defined as:

> [A] "wickedness of disposition, hardness of heard, cruelty, recklessness of consequences, and a mind regardless of social duty, although a particular person may not be intended to be inured . . . ."] [M]alice may be found where the defendant consciously disregarded an unjustified and extremely high risk that his action might cause serious bodily injury.

Commonwealth v. Dunphy, 20 A.3d 1215, 1219 (Pa. Super. 2011). The fact that the Defendant shot Gula, left the scene, and did not render any aid was relevant to whether he committed the unlawful killing with malice. The individual filming attempted to pursue the Defendant as he left the crime scene.[15]

Second, the video was highly relevant to whether Gula was in possession of a weapon at the time of the shooting. Throughout the trial, defense counsel questioned witnesses and police on whether they searched for a weapon and whether they found one. Defense counsel also alluded to the fact that a bystander or a friend of Gula's may have taken the weapon. The Defendant himself stated that he saw Gula reach for something prior to him shooting him. The video was taken moments after the shooting and showed Gula being treated by a bystander and that no weapon was near his vicinity. This evidence was also relevant to the charge of Voluntary Manslaughter.

---

[15] See supra p. 10.

25

Finally, the video was relevant in that it corroborated and discredited the testimony of some of the witnesses. The testimony presented at trial varied greatly from witness to witness. No two witnesses presented identical statements and thus the video allowed the jury to determine which witnesses had the best recollection of the events. In addition, the video showed the people that gathered at the crime scene and discredited the Defendant as no one could be heard yelling to get him, which he stated was the reason he fled.[16] Based on the essential relevant nature of the video and the fact that the video was not overly graphic, the Court properly allowed the video to be shown to the jury and to be introduced into evidence.

***Whether evidence that Gula carried a knife should have been permitted at trial;***

The Defendant argues that the Court improperly precluded evidence that Gula had once had a knife one year prior to the shooting. N.T., 8/15/2011, p. 45-47, 131-35. Under the Pennsylvania Rules of Evidence, all relevant evidence is admissible and "relevant evidence" is defined as "having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Pa.R.E. 401, 402.

In support of their position, defense counsel relies on Clark. Commonwealth v. Clark, 421 A.2d 374 (Pa. Super. 1980). In Clark, a rape victim saw her attacker approximately a month after the incident occurred. Id. at 375. The victim was arrested and a knife was found in his pocket. Id. During the incident the attacker had used a sharp object; however, the victim was unable to describe it. Id. The Superior Court affirmed the trial court's decision to allow the knife into evidence and the finding that it was relevant. Id. at 376.

---

[16] See supra p. 13. The Defendant's testimony also conflicted with Houseknecht in regards to the amount of people at the crime scene.

26

Here, the fact that a witness saw Gula carry a knife approximately one (1) year prior to the shooting was not relevant to this case. Defense counsel's proffer was that "Hendershot would testify that he had seen Andrew Gula with a knife when they were in school." N.T., 8/15/2012, p. 132. The context of how he saw the knife was not established.[17] In Clark, the attacker had used a sharp object in his attack and the Defendant was found with a knife a month later. In this case, no testimony or evidence was ever presented to indicate that Gula had a knife on him. The Defendant had testified in regards to what he knew about Gula carrying a knife. The fact that a witness saw Gula with a knife one year prior to the shooting and that it was information not offered by the Defendant, makes it irrelevant and remote to any fact that was of consequence in this trial.

### *Whether the Court improperly denied giving jury instructions for Involuntary Manslaughter*

The Defendant argues that the Court improperly denied the Defendant's request to give the jury instruction for Involuntary Manslaughter. Following testimony being given by both parties, the Court had a conference regarding jury instructions. At that time, the Commonwealth withdrew the charges of Count 3, Involuntary Manslaughter; Count 5, Aggravated Assault; and Count 6, Recklessly Endangering Another Person. N.T., 8/15/2012, p. 142. Defense counsel objected to the removal of the Involuntary Manslaughter charge and requested that the Court still give the jury instruction. This Court, however, found that there was no evidence to indicate Involuntary Manslaughter based on the evidence and testimony presented at trial and denied the Defendant's request.

---

[17] The Defendant and Gula had taken course together at Pennsylvania College of Technology. According to the Defendant, they had taken Electrical Principles, Automotive Electrics, and an Engine Principles classes together. N.T., 8/15/2012, p. 63.

27

In Williams, which is relied upon by the Defendant, a robber beat to death a blind man during the course of the crime. Commonwealth v. Williams, 415 A.2d 403, 404 (Pa. 1980). The Pennsylvania Supreme Court held that "in a murder prosecution, an involuntary manslaughter charge shall be given only when requested, and where the offense has been made an issue in the case and trial evidence reasonably would support such a verdict." The Supreme Court gave the following justification for their holding:

> The rule is firmly grounded in logic and policy, for to instruct a jury on possible verdicts that are unsupported by any evidence can serve only to pervert justice: not only may the jury be confused by what appear to be irrelevant instructions, and thereby possibly reach a mistaken verdict, but a conviction for the lesser offense may occur out of discriminatory favor for the defendant or out of animosity for the victim, or the jury might substitute its own visceral reaction for the classification established by the legislature.

Id. at 404-05 (citations omitted). Following the clarification on the law, the Supreme Court found that there was no rationale for an involuntary manslaughter jury instruction to be given. Id. at 405; see also Commonwealth v. Long, 579 A.2d 970 (Pa. Super. 1990) (finding that a defendant intentionally fired a shot as the victim ran away did not warrant an involuntary manslaughter jury instruction).

Here, there was no evidence provided by the Commonwealth or the Defendant that would support a verdict for Involuntary Manslaughter. "A person is guilty of involuntary manslaughter when as a result of the doing of an unlawful act in a reckless or grossly negligent manner, or the doing of a lawful act in a reckless or grossly negligent manner, he causes the death of another person." 19 Pa.C.S. § 2504(a). While on the stand, the Defendant stated numerous times that he intentionally shot Gula and that he did so because he was in fear of his own life. As the record indicates, the Defendant acted intentionally or knowingly and there was no evidence to support an Involuntary Manslaughter charge or instruction.

28

## ORDER

AND NOW, this ___2nd___ day of April, 2013, based upon the foregoing Opinion, it is

hereby ORDERED and DIRECTED that the Defendant's Post Sentence Motion is DENIED.

By the Court,

Nancy L. Butts, President Judge

xc: Aaron Biichle, Esq.
    Ken Osokow, Esq.
    Jeana Longo, Esq.
    William Miele, Esq.

32